## Case No. 5,537.

### GOODFELLOW v. MUCKEY et al.

[1 McCrary (1881) 238.] [1]

Circuit Court, D. Kansas.

INDIAN TREATY—CONSTRUCTION OF GRANT MADE THEREBY—INDIAN TITLE POSSESSORY IN GENERAL—POTTAWATOMIE TREATY, NOT A GRANT IN PRESENTI.

1. Grants and reservations claimed under Indian treaties are strictly construed against the grantee or beneficiary.

2. It has been uniformly held by the supreme court of the United States that, in the absence of express legislation by congress to the contrary, the Indian title is but a right of occupancy, the fee remaining in the United States.

3. The treaty between the United States and the Pottawatomie tribe of Indians, of November 15, 1861 (12 Stat. 1192), is not an exception to this general rule, and does not amount to a grant in presenti.

[At law. Action by William Goodfellow against Joseph Muckey, Mary Muckey, and L. H. Ogee.]

Before DILLON, Circuit Judge, and FOSTER, District Judge.

FOSTER, District Judge. This is an action of ejectment brought by the plaintiff to recover the south half of section thirty, town ten, range fifteen, in Shawnee county, Kansas. The plaintiff claims title by a master's deed, made under judicial sale, of land on decree of a foreclosure of a mortgage executed by Joseph Muckey. The land in controversy was allotted to Mary Muckey, a minor, under the treaty between the United States and the Pottawatomie tribe of Indians, concluded on the fifteenth day of November, 1861 (12 Stat. 1192), and afterwards, on the sixteenth day of May, 1870, patented to Joseph Muckey, the head of a family, under the provisions of article six of the treaty between the United States and the Pottawatomie tribe, concluded February 27, 1867 (15 Stat. 533).

So much of the treaty of 1861 as is pertinent in this case is as follows:

"Article 1. The Pottawatomie tribe of Indians, believing that it will contribute to the civilization of their people to dispose of a portion of their present reservation in Kansas, consisting of five hundred and seventy-six thousand acres, which was acquired by them for the sum of $87,000, by the fourth article of the treaty between the United States and the said Pottawatomies, proclaimed by the president of the United States on the twenty-third day of July, 1846, and to allot lands in severalty to those of said tribe who have adopted the customs of the whites and desire to have separate tracts assigned to them, and to assign a portion of said reserve to those of the tribe who prefer to hold their lands in common; it is therefore agreed by the parties hereto that the commissioner of Indian affairs shall cause the whole of said reservation to be surveyed in the same manner as the public lands are surveyed; the expense thereof shall be paid out of the sales of land hereinafter provided for, and the quantity of land hereinafter provided, to be set apart to those of the tribe who desire to take their lands in severalty, and the quantity hereinafter provided to be set apart for the rest of the tribe in common, and the remainder of the land, after the special reservation hereinafter provided for shall have been made, to be sold for the benefit of said tribe.

"Article 2. It shall be the duty of the agent of the United States for said tribe to take an accurate census of all the members of the tribe, and to classify them in separate lists, showing the names, ages and number of those desiring lands in severalty and of those desiring lands in common, designating chiefs and head men respectively, each adult choosing for himself or herself, and each head of the family for the minor children of such family, and the agent for orphans and persons of an unsound mind; and thereupon there shall be assigned, under the direction of the commissioner of Indian affairs, to each chief, at the signing of the treaty, one section; to each head man, one-half section; to each other head of a family, one-quarter section; and to each other person, eighty acres of land, to include in every case, as far as practicable, to each family, their improvements, and a reasonable portion of timber, to be selected according to the legal subdivision of survey. When such assignment shall have been completed, certificates shall be issued by the commissioner of Indian affairs for the tracts assigned in severalty, specifying the names of the individuals to whom they have been assigned. respectively, and that said tracts are set apart for the perpetual and exclusive use and benefit of such assignees and their heirs. Until otherwise provided by law, such tracts shall be exempt from levy, taxa-

---

[1] [Reported by Hon. Geo. W. McCrary, Circuit Judge, and here reprinted by permission.]

tion or sale, and shall be alienable in fee, or leased or otherwise disposed of, only to the United States or to persons then being members of the Pottawatomie tribe, and of Indian blood, with the permission of the president, and under such regulations as the secretary of the interior shall provide, except as may be hereinafter provided; and on receipt of such certificates the person to whom they are issued shall be deemed to have relinquished all right to any portion of the land assigned to others, in severalty, or to a portion of the tribe in common, and to the proceeds of the sale of the same whensoever made.

"Article 3. At any time hereafter when the president of the United States shall have become satisfied that any adults, being males and heads of families, who may be allottees under the provisions of the foregoing article, are sufficiently intelligent and prudent to control their affairs and interests, he may, at the request of such persons, cause the lands severally held by them to be conveyed to them by patent in fee simple, with power of alienation; and may, at the same time, cause to be paid to them, in cash or in the bonds of the United States, their proportion of the cash value of the credits of the tribe, principal and interest, then held in trust by the United States, and also as the same may be received, their proportion of the proceeds of the sale of lands under the provisions of this treaty; and on such patents being issued and such payments ordered to be made by the president, such competent persons shall cease to be members of said tribe, and shall be become citizens of the United States, and thereafter the land so patented to them shall be subject to levy, taxation and sale, in like manner with the property of other citizens; provided, that before making any such application to the president, they shall appear in open court in the district court of the United States for the district of Kansas, and make the same proof and take the same oath of allegiance as is provided by law for the naturalization of aliens, and shall also make proof to the satisfaction of said court that they are sufficiently intelligent and prudent to control their affairs and interests, and that they have adopted the habits of civilized life, and have been able to support, for at least five years, themselves and families.

"Article 4. To those members of said tribe who desire to hold their lands in common, there shall be set apart an undivided quantity sufficient to allow one section to each chief, one-half section to each head-man, and one hundred and sixty acres to each other head of a family, and eighty acres of land to each other person, and said land shall be held by that portion of the tribe for whom it is set apart, by the same tenure as the whole reserve has been held by all of said tribe, under the treaty of one thousand eight hundred and forty-six. And upon such land being as-

signed in common, the persons to whom it is assigned shall be held to have relinquished all title to the land assigned in severalty, and in the proceeds of sales thereof whenever made."

Under the third article of this treaty a certificate of allotment for this land was issued to Mary Muckey, numbered 1,285, said allottee being a child perhaps a year old.

The sixth article of the treaty of 1867 reads as follows:

"Article 6. The provision of article third of the treaty of April nineteenth, eighteen hundred and sixty-two, relative to Pottawatomies who desire to become citizens, shall continue in force, with the additional provision that, before patents shall issue and full payments be made to such persons, a certificate shall be necessary from the agent and business committee that the applicant is competent to manage his own affairs; and when computation is made to ascertain the amount of the funds to which such applicants are entitled, the amounts invested in the new reservation provided for in the treaty shall not be taken into account; and where any member of the tribe shall become a citizen under the provisions of the said treaty of eighteen hundred and sixty-two, the families of said parties shall also be considered as citizens, and the head of the family shall be entitled to patents and the proportional share of funds belonging to his family; and women who are also heads of families, and single women of adult age, may become citizens in the same manner as males."

Under this article a patent for said land was issued to Joseph Muckey as the head of the family. The patent recites the issuing of the certificate of allotment, but purports to convey the absolute title in fee to the patentee. Joseph Muckey mortgaged the land, and the mortgage was foreclosed, the land sold, and this plaintiff became the purchaser thereof.

The question arises, did Joseph Muckey have such a title that he could make a valid conveyance? The plaintiff maintains that the patentee held the absolute fee simple title free from all equities or trusts in favor of the allottee. On the other hand it is claimed by defendants, that by the treaty of 1861, and the certificate of allotment issued in pursuance thereof to Mary Muckey, the whole title of the government to the land passed to the allottee as by absolute, irrevocable grant, and that the patent subsequently issued to Joseph Muckey as the head of the family, under article six of the treaty of 1867, was absolutely null and void.

As a rule, legislative grants must be interpreted, if practicable, so as to effect the intention of the grantor, but if the words are ambiguous, the true rule is to construe them most strongly against the grantee. Rice v. Railroad Co., 1 Black [66 U. S.] 360. All grants of this description are strictly construed against the grantee; nothing passes but what is conveyed in clear and explicit language. Railroad Co. v. Litchfield, 23 How. [64 U. S.] 66. This rule of construction may

very aptly be applied to grants and reservations claimed under Indian treaties. It has been the traditionary policy of the government in treating with the Indian tribes, to reserve from the public domain tracts of land for the use and occupation of the Indian tribes, and to limit them to such reservations. The right of the Indians to have and occupy these lands for themselves and their families, has been granted in language more or less comprehensive, but always evincing a purpose on the part of the general government to limit the Indian title to the use and occupation of the land. In some instances their lands have been patented to them in fee simple so long as they should exist as a nation and remain on the land. Such were the provisions of the treaties with the Senecas and the Shawnees, made in 1861. 7 Stat. 349, 352. In most treaties the words "set apart" and "reserved" are used in appropriating portions of the public lands for the homes of the Indian tribes. In the treaty with the Menomonies of Wisconsin, in 1831 (7 Stat. 342), the following language was used: "The following described tract of land, at present owned and occupied by the Menomonie Indians, shall be set apart and designated for their future homes." The supreme court in construing this treaty use the following language: "The land thus recognized as belonging to the Menomonie tribe, embraced the section in controversy in this case. * * * But the right that the Indians held was only that of occupancy. The fee was in the United States subject to that right, and could be transferred by them whenever they chose." Beecher v. Wetherby, 95 U. S. 525. It has been uniformly held by the supreme court that the Indian title was but a right of occupancy, the fee remaining in the United States. U. S. v. Cook, 19 Wall. [86 U. S.] 592; Johnson v. McIntosh, 8 Wheat. [21 U. S.] 574; Worcester v. Georgia, 6 Pet. [31 U. S.] 580; Cherokee Nation v. Georgia, 5 Pet. [30 U. S.] 48; Fletcher v. Peck, 6 Cranch [10 U. S.] 142; 1 Kent, Comm. 259. And unless there is a clear and explicit provision in the treaty, showing that the government intended to make a grant in fee simple, the court will not presume a new departure has been made, or that a different policy from that pursued in the past was intended. Now, there is but little in this treaty to justify the court in finding a grant made or intended to be made to the allottees.

It was undoubtedly the desire of the government to induce the Indians to adopt the modes and habits of civilized life whenever it could be accomplished, and as a step in that direction, the plan of allotment in severalty to those of the tribe who had adopted the customs of the whites, and were willing to abandon all claims to the common lands and funds, was adopted. It was optional with the adult Indian to have his land in common with the tribe, or to have it allotted to him in severalty; the head of the family

choosing for the minor children, and the agent for orphans and those of unsound mind. It further provides that certificates shall issue to the allottees for the tracts assigned in severalty, specifying the individuals to whom they had been assigned respectively, and that said tracts are set apart for the perpetual and exclusive use and benefit of said assignees and their heirs. The allotted lands were exempt from taxation and sale, and were not alienable by the allottee. That the contracting parties to this treaty did not regard the fee as becoming invested in the allottee by virtue of article two, and the certificate issued in pursuance thereof, is demonstrated by the next article, for it is therein provided how the adult allottees may obtain that title. It provides in substance that when he should make it appear to the United States district court that he had adopted the habits of civilized life, and that he was sufficiently intelligent and prudent to control his own affairs, and take the oath of allegiance, etc., he could then apply to the president of the United States for a patent, and the president, on being satisfied that he was competent to control his own affairs, might cause the lands to be conveyed to him by patent in fee simple with power of alienation; and when the patent was made and the fund distributed, the patentee became a citizen of the United States and ceased to be a member of the tribe, and the lands were subject to taxation, sale, etc. That the contracting parties anticipated that these allotments would ultimately ripen into perfect titles through the proceedings specified in article three, is altogether probable; but that event might or might not happen. If the intention of the grantor is the controlling consideration in construing this treaty, as decided in Rice v. Railroad Co., supra, what better evidence is needed of that intention than the treaty of 1867, which was assented to and approved by the Pottawatomies themselves? The fourth and sixth articles of that treaty are quite inconsistent with the idea of a grant in presenti under the former treaty.

The principal object of the treaty of 1867 was clearly to cause the removal to the Indian Territory of such of the tribe as had not and would not become citizens. Article four required a registry to be made under the control of the agent, showing the names of all members of the tribe who desired to remove to the new reservation, and of all who desired to remain and become citizens. Now under the former treaty, the head of the family may have become a citizen and received a patent for his land, and was no longer a member of the tribe, while his minor children, and perhaps his wife, were still members of the tribe, without provision for severing that relation. So it resulted that he could not elect to go to the new reservation, while his family might. Here was a capital opportunity for this unnaturalized female, the mother of this unregenerated brood,

to assert the doctrine of woman's rights, and lead them all off to the Indian country, leaving the newly fledged male citizen the victim to his vaulting ambition to taste the fruits of civilization and become a white man. This peculiar situation called for some relief, and hence the provision in the sixth article making the whole family citizens in cases where the head had or should become a citizen. Why the patent should be issued to him for all the land allotted to his family is not so apparent. But they were then all citizens of the United States and no longer Indians. They had passed from the tutelage and control of the government, and become invested with all the privileges of other citizens. What was to be done with the title to their lands? Should the government hold it until they became of age or make conveyance directly to the minor allottees; or place it in the head of the family? The head of the family had established his ability to manage his own affairs and had become a citizen, and who was more suitable to take this title than the natural guardian of the allottees? I can see no reason why the United States and the Pottawatomie Indians, having the undoubted right to make provisions in the treaty of 1861, allotting these lands in severalty and for patenting the same as provided therein, had not the same right and power to amend that treaty, and provide for transferring the legal title to the parent or guardian of the allottee. This being an action in ejectment, the paramount legal title must control, and it is not necessary at this time to decide whether the patentee took the title in trust for the allottee, or in what manner the trust, if any, could be properly executed, or whether notice thereof should be imputed to the purchaser of the legal title. Judgment must go for the plaintiff.